IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

|  |  |  |
|---|---|---|
|  | * |  |
| COLOMBO BANK, F.S.B., |  |  |
|  | * |  |
| Appellant, |  |  |
|  | * |  |
| v. |  | CIVIL NO.: WDQ-07-0514 |
|  | * |  |
| CHARLES R. GOLDSTEIN, |  |  |
|  | * |  |
| Appellee. |  |  |
|  | * |  |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

MEMORANDUM OPINION

Pending is Colombo Bank, F.S.B.'s (the "Bank") appeal of the judgment of the United States Bankruptcy Court for the District of Maryland (the "Bankruptcy Court"), for Charles R. Goldstein, the Chapter 7 Bankruptcy Trustee (the "Trustee"), on his Complaint to Recover Preferential Transfers and Fraudulent Conveyances (Adversary Proceeding No. 00-5578-JS).  Also pending is the Bank's motion to waive supersedeas and stay execution of judgment pending appeal (Paper No. 6).  Because the issues have been fully briefed on appeal and the decisional process would not be significantly aided by oral argument, such argument is unnecessary.  Bankr. Rule 8012.  For the reasons stated below, the judgment of the Bankruptcy Court will be affirmed in part, reversed in part, and modified in part, and Bank's motion will

1

be denied as moot.

I.  Background

An involuntary bankruptcy petition was filed on March 17, 1998 against Maryland Property Associates ("MPA") by Chesapeake Village Trust Limited Partnership; Cumberland Associates Limited Partnership, Freedom Associates Limited Partnership, Lansdowne Associates Limited Partnership, Uplands Associates A Limited Partnership, and Uplands Associates B Limited Partnership (the "Partnerships").  *Goldstein v. Colombo Bank*, No. 00-5578-JS, slip op. at 2 (Bankr. D. Md. Oct. 14, 2002) (cited *infra* as "Bankr. Op. 1").

The Partnerships were Maryland limited partnerships, each of which owned a U.S. Department of Housing and Urban Development ("HUD") mortgage-insured, low-income apartment complex in Maryland.  *Id.*  MPA was a Maryland corporation that managed those apartment complexes for the Partnerships, and was principally owned by Monte D. Greenbaum.[1]  *Id.* at 3.

On March 24, 1998, an order for relief under Chapter 7 was

---

[1] On January 2, 2001, Greenbaum pleaded guilty to conspiracy to defraud HUD under 18 U.S.C. § 371 and was sentenced to 18 months of imprisonment, a $100 special assessment, and $900,000 of restitution to HUD.  Pl.'s Exs. 7, 8.

entered by the Bankruptcy Court upon MPA's consent.  *Id.*

On March 17, 2000, the Trustee sued the Bank for the avoidance and recovery of 24 transfers made by MPA or its alter egos[2] to the Bank during the three years preceding the filing of the bankruptcy petition.  *Id.*  Count I of the Complaint sought avoidance under the Maryland Uniform Fraudulent Conveyance Act (the "UFCA"), Commercial Law Article §§ 15-201 to 15-214, made applicable by Bankruptcy Code § 544(b);[3] Count II claimed the transfers were recoverable as fraudulent conveyances under Bankruptcy Code § 548; and Count III sought to recover those payments made within 90 days of the filing of the bankruptcy petition as preferential transfers under Bankruptcy Code § 547. *Goldstein v. Colombo Bank,* No. 00-5578-JS, slip op. at 9, 14, 18 (Bankr. D. Md. Jan. 31, 2007) (cited *infra* as "Bankr. Op. 2").

The evidence demonstrated that Greenbaum took more money from MPA than he was owed for his property management services.

---

[2] On April 24, 1998, the Trustee filed further involuntary petitions on behalf of MPA against MPA's alter-egos: Maryland Property Management, Inc., Maryland Property Group, Inc., Maryland Group Management, Inc., Maryland Property Systems, Inc., and Maryland Property Services, Inc.  Bankr. Op. 1 at 2-3. Consent orders for relief under Chapter 7 were entered for those companies on May 1, 1998.  *Id.* at 2.

[3] Bankruptcy Code § 544(b) permits trustees in bankruptcy to avoid any debtor's transfer avoidable by a creditor under state law, such as the UFCA.  11 U.S.C. § 544(b).

Tr. at 113-119, 133.  During the same period, Greenbaum took loans from the Bank secured by his personal residence in Columbia, Maryland and his condominium in Ocean City, Maryland. *Id.* at 156-57, 174-76.

Because Greenbaum was also siphoning money from the Partnerships, he was unable to show that they had a cash surplus, or that all of the tenants' security deposits were properly escrowed, as required by HUD.  *Id*. at 106-10.  To conceal this, Greenbaum caused the Partnerships to take loans from the Bank and deposited the loan proceeds into accounts at the Bank in the Partnerships' names.  *Id*.  The loans, referred to in this case as the "Share Loans," had the unusual characteristic of being secured by their own proceeds.  *Id.* at 115-16, 135-37.  Thus, the Partnerships appeared to have sufficient capital; but in reality, the money in their accounts was borrowed and encumbered by the Bank's security interests.

Although the Bank denied knowledge of the Share-Loan scheme, Thomas Knowles, then the Bank's president, admitted that he thought the loans were unusual, had signed two audit forms falsely indicating that the accounts were unencumbered, and had used a word processor to create statements falsely indicating that the accounts were not bearing interest.  *Id*. at 243-44, 246-47, 250-56.

Greenbaum eventually used MPA's money to pay off the Share Loans. *Id.* at 143-44. During the period, he also caused MPA to make transfers to the Bank in payment of the loans secured by his Columbia residence and Ocean City condominium. *Id.* at 92-93.

The Trustee grouped the 24 contested transfers into four categories: (1) payments made on the Share Loans; (2) payments made on the mortgage on Greenbaum's condominium in Ocean City; (3) payments made on the second mortgage on Greenbaum's home in Columbia; and (4) transfers made to the Bank for "unexplained reasons." *Id.* at 4. The total face amount of the transfers totaled $518,675.05, of which the Trustee sought to avoid $444,523.89. Bankr. Op. 2 at 23.

Following a three-day trial, on October 14, 2002, the Bankruptcy Court granted full relief to the Trustee and ordered the Bank to pay the estate $444,523.89. Bankr. Op. 1 at 13.

On October 24, 2002, the Bank appealed the decision to this Court, arguing that it was not supported by the evidence adduced at trial, and the Bankruptcy Court erred in allowing the Trustee to amend his Complaint at trial and to testify as an expert witness.

This Court's July 16, 2003 Memorandum Opinion and Order, as modified on 29 August, 2003, affirmed in part, vacated in part,

and remanded for further proceedings. *ColomboBank v. Goldstein*, WDQ-02-4010, slip op. at 14 (D. Md. July 16, 2003) (cited *infra* as "Op. 1"); *ColomboBank v. Goldstein*, WDQ-02-4010, slip op. at 3 (D. Md. Aug. 29, 2003) (cited *infra* as "Op. 2").

The Court affirmed: (1) the Bankruptcy Court's evidentiary and procedural decisions (Op. 1 at 14); (2) the Bankruptcy Court's factual findings that (a) the Share-Loan Transfers were intentionally fraudulent (*id.* at 10), (b) the Bank "knew or should have known" of the fraudulent Share-Loan scheme (*id.* at 10, 12), and (c) MPA was insolvent at all relevant times (*id.* at 13); and (3) the portion of the Bankruptcy Court's judgment avoiding all Share-Loan transfers in the amount of $276,180.18 (*id.* at 12-13; Op. 2 at 2-3).

The Court vacated the remainder of judgment and remanded for further proceedings as to the non-Share-Loan transfers. Specifically, the Court instructed that to set aside the non-share-loan transfers as actually fraudulent under Maryland's Commercial Law Article § 15-207, the Bankruptcy Court had to find that, with respect to those transfers: (1) Greenbaum intended to defraud MPA's creditors; and (2) the Bank had at least constructive knowledge of such fraud. Op. 1 at 13. Alternatively, to set aside the non-share-loan transfers as constructively fraudulent under § 15-204, the Bankruptcy Court

had to find that the non-Share-Loan transfers were made without fair consideration.  Op. 1 at 14.

On January 31, 2007, the Bankruptcy Court issued its Memorandum Opinion and Order avoiding all 24 conveyances as actually and constructively fraudulent.  Bankr. Op. 2 at 59; *Goldstein v. Colombo Bank,* No. 00-5578-JS (Bankr. D. Md. Jan. 31, 2007) (order granting judgment).  The Bankruptcy Court ordered the recovery of $444,523.89 from the Bank with 6.20% prejudgment interest from the date of the Complaint and 5.10% postjudgment interest from the January 31, 2007 Order.  *Id.*  In reaching the judgment, the Bankruptcy Court found that: (1) MPA, through Greenbaum, intended to defraud MPA's creditors with the non-Share-Loan transfers (Bankr. Op. 2 at 53 ¶ 15); (2) the Bank had at least constructive knowledge that the non-Share-Loan transfers were actually fraudulent (*id.* at 54-58, ¶¶ 17-25); and (3) MPA did not receive fair consideration for the non-Share-Loan transfers (*id.* at 48-49, ¶¶ 4-6)

II.  Discussion

The Bank argues that the Bankruptcy Court erred in the three factual determinations required by this Court on remand, and further contends that the Bankruptcy Court exceeded the scope of the remand and erred by: (1) finding that the Bank

knowingly participated in the Share-Loan scheme; (2) determining that the Bank was not entitled to a credit for approximately 3/4 of the $444,523.89 judgment; and (3) entering a new judgment on remand, instead of making only factual and legal determinations.

II.A.  Standard of Review

"On an appeal, the district court . . . may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings."  Bankr. Rule 8013.  The district court reviews a bankruptcy court's legal decisions *de novo* and findings of fact for clear error.  *Id.*; *First Nat'l Bank v. Stanley* (*In re Stanley*), 66 F.3d 664, 667 (4th Cir. 1995).  A finding of fact is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  *United States* v. *U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).  "Deference to the bankruptcy court's findings is particularly appropriate when, as here, the bankruptcy court presided over a bench trial in which witnesses testified and the court made credibility determinations."  *In re Official Committee Of Unsecured For Dornier Aviation (North America), Inc.*, 453 F.3d 225, 235 (4th Cir. 2006).

8

II.B.   Applicable Fraudulent-Transfer Law

Both Bankruptcy Code § 548 and the UFCA permit the avoidance of a transfer if: (1) it was made with the actual intent to hinder, delay, or defraud a creditor (an "actually fraudulent" transfer); or (2) the debtor received less than reasonably equivalent value in exchange, and the debtor was insolvent (a "constructively fraudulent" transfer).  11 U.S.C. § 548(a); Md. Code Ann., Com. Law §§ 15-204, 15-207.  Although the UFCA allows transfers to be set aside for three years preceding the petition, the version of the federal statute in effect when the petition was filed restricted avoidance to one year.[4]  Md. Code Ann., Cts. & Jud. Proc. § 5-101; 11 U.S.C. § 548(a).  As the judgment on appeal sets aside transfers preceding the petition by three years, the Court reviews the Bankruptcy Court's decisions under the UFCA.

Maryland's Commercial Law Article § 15-207 provides that:

[e]very conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud present or future creditors, is fraudulent as to both present and future creditors.

Md. Code Ann., Com. Law § 15-207.  Maryland's Commercial Law

---

[4] Section 1402 of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 amended § 548(a) to permit avoidance of transfers two years prior to the petition.  Pub. L. No. 109-8, 119 Stat. 23, 214 (Apr. 20, 2005).

Article § 15-204 provides that:

> [e]very conveyance made and every obligation incurred by a
> person who is or will be rendered insolvent by it is
> fraudulent as to creditors without regard to his actual
> intent, if the conveyance is made or the obligation is
> incurred without a fair consideration.

Md. Code Ann., Com. Law § 15-204.  Section 15-209 further

provides that a fraudulent conveyance may be set aside "against

any person except a purchaser for fair consideration without

knowledge of the fraud at the time of the purchase."  Md. Code

Ann., Com. Law § 15-209.  Thus,

> [w]here a conveyance is valid on its face, the burden of
> proof is upon the party attacking the conveyance to show
> either (1) that it was not made upon a good consideration,
> or (2) that it was made with a fraudulent intent on the
> part of the grantor to hinder, delay or defraud his
> creditors, and that this intent was known to or
> participated in by the grantee.

*Oles Envelope Corp. v. Oles*, 193 Md. 79, 89 (1949).  A

transferee's constructive knowledge of the transferor's

fraudulent intent is sufficient to avoid the transfer.  *Fick v.*

*Perpetual Title Co.*,  115 Md. App. 524, 540 (Md. Ct. Spec. App.

1997).


II.C.  Analysis

II.C.1.  The Scope of the Findings on Remand

        The Bank argues that the Bankruptcy Court erred in making

findings of fact and conclusions of law that went beyond the

scope of this Court's remand.  The Bank specifically contends
that the Bankruptcy Court: (1) changed its earlier finding that
the Bank had only constructive knowledge of the Share-Loan
transfers to a finding of actual knowledge and participation in
the scheme; (2) offered a new legal rationale for its avoidance
of transfers that the Bank had allegedly returned to MPA; and
(3) substituted a higher postjudgment interest rate than the
rate applicable to the October 14, 2002 Order.

     The Court will address the Bank's first contention before
addressing the Bankruptcy Court's factual findings on the Bank's
knowledge of the non-Share-Loan transfers, and will deal with
the Bank's remaining complaints about the scope of the
Bankruptcy Court's most recent opinion in sections II.C.4 and
II.C.5, below.

     In its earlier opinion, the Bankruptcy Court found that, *at
a minimum*, the Bank had constructive knowledge of the Share-Loan
fraudulent transfers:

>    The evidence demonstrated that Colombo Bank facilitated
>    this scheme by which those creditors were defrauded. . . .
>    The concealment under the share loan scheme lasted for
>    years.  The Bank helped facilitate this concealment by
>    concealing the nature of the accounts.
>         . . . Colombo Bank knew or should have known of the
>    fraud.

Bankr. Op. 1.  A more limited finding of knowing participation
in the Share-Loan scheme was not precluded by Bankruptcy Court,

and was not necessary, as the Bank's constructive knowledge was sufficient to avoid the contested transfers.

This Court's remand required the Bankruptcy Court to make further factual determinations regarding the Bank's knowledge of the non-share-loan transfers.  Op. 1 at 13.  The Bankruptcy Court thus found it necessary to refine its earlier determination of the extent of the Bank's knowledge of the Share-Loan scheme to determine whether the Bank was on inquiry notice of the other fraudulent transfers.  Although the Bankruptcy Court's factual determinations provide more definitive support for the avoidance of the Share-Loan transfers, they are not inconsistent with the Bankruptcy Court's earlier findings and do not alter that portion of the Bankruptcy Court's earlier judgment affirmed by this Court in its July 16, 2003 Order.

II.C.2.  Actual Fraud

II.C.2.a.  MPA's Intent to Defraud

The Bankruptcy Court found that, like the Share-Loan transfers, Greenbaum, as the owner and operator of MPA, made the non-Share-Loan transfers with the actual intent to defraud MPA's creditors.  Bankr. Op. 2 ¶ 15.  The Bank argues that the evidence cited by the Bankruptcy Court does not support its

12

finding of MPA's fraudulent intent with respect to the non-Share-Loan transfers.

The Bankruptcy Court based its finding on Greenbaum's testimony and plea agreement[5] and certain indicia of fraud, including MPA's insolvency, the lack of consideration given for the non-Share-Loan transfers, secrecy or concealment, and the departure from usual business methods, citing *Berger v. Hi-Gear Tire & Auto Supply, Inc.*, 257 Md. 470, 476-77 (1970).[6]  Bankr. Op. 2 ¶¶ 8, 14-15.

The testimony of Greenbaum cited by the Bankruptcy Court consists mostly of Greenbaum's recitation of his admissions in his plea agreement.  Hr'g Tr. 105-14, May 14, 2001.  The

---

[5] See note 1, *supra*.

[6] In *Berger*, the Maryland Court of Appeals stated that:
    [a]mong the generally recognized badges of fraud are the insolvency or indebtedness of the transferor, lack of consideration for the conveyance, relationship between the transferor and the transferee, the pendency or threat of litigation, secrecy or concealment, departure from the usual method of business, the transfer of the debtor's entire estate, the reservation of benefit to the transferor, and the retention by the debtor of possession of the property.
        Although it has been said that a single badge of fraud may stamp a transaction as fraudulent, it is more generally held that while one circumstance recognized as a badge of fraud may not alone prove fraud, where there is a concurrence of several such badges of fraud an inference of fraud may be warranted.
*Berger*, 257 Md. at 476-77.

testimony, and the plea agreement, show only that Greenbaum unlawfully diverted money from the Partnerships' accounts--they do not indicate his intent regarding the non-Share-Loan transfers from MPA. *Id.*, Pl.'s Ex. 7.[7]

As for the indicia of fraud listed by the Bankruptcy Court, the secrecy or concealment and departure from normal business methods aptly describe the Share-Loan scheme, but there is no explanation in the Bankruptcy Court's Opinion of how it found the non-Share-Loan transfers secretive or unusual.  This leaves only MPA's insolvency and the lack of consideration as indicia of fraud evidencing Greenbaum's intent regarding the non-Share-Loan transfers.

In such an evidentiary context, the UFCA supports a determination of constructive fraud.  Under § 15-204, proof of insolvency and a lack of fair consideration render a transaction avoidable regardless of the transferor's actual intent or the transferee's knowledge.  The Bankruptcy Court's conclusion that the transfers were actually fraudulent is not supported by the evidence.

---

[7] For consistency with the parties' briefs, the Appellant's exhibits are referenced as "Def.'s Ex. #," and the Appellee's as "Pl.'s Ex. #."

II.C.3.  Constructive Fraud

The Bankruptcy Court found that the Bank failed to satisfy its burden of showing that fair consideration was provided for the non-Share-Loan transfers.  As the court had previously determined that MPA was insolvent at the times the transfers were made, it concluded that the transfers were constructively fraudulent under the UFCA.

The Bankruptcy Court placed the burden of proving fair consideration for the transfers on the Bank, but provided no explanation for this shift of the evidentiary burden, other than citations to Maryland case-law.  The cited cases reveal that, in Maryland, "[i]t is well established . . . that facts and circumstances may be such as to shift the burden to the grantee to establish the bona fides of the transaction." *Berger*, 257 Md. at 475 (*citing Long v. Dixon*, 201 Md. 321, 323 (1953); *Kline v. Inland Rubber Corp.*, 194 Md. 122, 138 (1949); *Kennard v. Elkton Banking and Trust Co.*, 176 Md. 499, 503 (1939); *McCauley v. Shockey*, 105 Md. 641, 645 (1907)).  Other case-law confirms that the concurrence of several badges of fraud is sufficient to shift the burden of proving fair consideration to the transferee.  *Wellcraft Marine Corp. v. Roeder*, 314 Md. 186, 189, 192 (1988); *Drury v. State Capital Bank*, 163 Md. 84, 88 (1932).

Although one badge of fraud, MPA's insolvency, is apparent,

the Bankruptcy Court does not identify other indicia of fraud in
the non-share-loan transfers that justify placing the burden of
proving fair consideration onto the Bank.  MPA's insolvency
alone does not justify the shift.  The factual findings of the
Bankruptcy Court must therefore be scrutinized for clear error
with the burden of persuasion placed correctly on the Trustee's
shoulders.

II.C.3.a.  Transfers for Greenbaum's Loan Obligations

The Bankruptcy Court found that the transfers to the Bank
for payment on the loans secured by Greenbaum's Columbia
residence and Ocean City condominium were for the exclusive
benefit of Greenbaum and his wife, and thus MPA received no
consideration for those conveyances.  Bankr. Op. 2 at 42-45 ¶¶
51-55, 49 ¶ 5.

A debtor does not receive fair consideration when a
transfer is made for the exclusive benefits of a third party.
*See Berger*, 257 Md. at 476 (antecedent debt of a third party is
not consideration to the debtor); *see also* 5-548 Alan N.
Resnick, *Collier on Bankruptcy* § 548.05 (15th ed. rev. 2007).

Rather than disputing the finding that the consideration
for MPA's residential loan payments was for the sole benefit of
Greenbaum and his wife, the Bank contends that the payments on

Greenbaum's personal debts were part of his compensation package, and that consideration to a third party that indirectly confers an economic benefit on the debtor is consideration to the debtor to the extent of that economic benefit, citing, *inter alia*, *Rubin v. Manufacturers Hanover Trust Co.*, 661 F.2d 979, 991-92 (2d Cir. 1981).

The sole evidence of this alleged compensation agreement was Greenbaum's testimony.  Tr. 155-57.  The Bankruptcy Court rejected this testimony because it found the compensation agreement was undocumented, unreported as income on Greenbaum's tax returns, unapproved by HUD, and Greenbaum's demeanor at trial indicated a lack of candor.  Bankr. Op. 2. at 48 ¶ 4 (*citing* TR. 108, Pl.'s Exs. 36, 37, Def.'s Ex. 43).  The court also relied on the Trustee's testimony that the Greenbaums' tax returns in 1995, 1996, and 1997 underreported the transfers made by MPA for the Benefit of Greenbaum and his wife.  Tr. 54, 218-19, Pl.'s Ex. 38.

The Bank argues that the Bankruptcy Court's rejection of Greenbaum's testimony was clear error because (1) the Trustee's testimony merely stated that "there is no direct way to tell" whether the Greenbaums declared MPA's payment of their personal obligations as income on their tax returns, and (2) the court's citation to page 108 of the transcript does not indicate that

Greenbaum's compensation agreement required HUD approval.

These two flaws in the Bankruptcy Court's Opinion do not alter the court's credibility determination.  There was no corroborating evidence of the alleged compensation agreement, the Greenbaums' tax returns underreported MPA's disbursements on their behalf, and the Bankruptcy Judge observed Greenbaum's demeanor on the witness stand.

Thus, even with the burden of proof left on the Trustee, the evidence that the payments of the Greenbaums' personal loans were for their exclusive benefit, and the lack of evidence, other than Greenbaum's testimony, that those transfers indirectly benefitted MPA, support the Bankruptcy Court's finding that the transfers were not made for fair consideration. Accordingly, that finding was not clear error.


II.C.3.b.  The "Unexplained" Transfers

The remaining non-Share-Loan transfers in question are the so-called unexplained transfers, Checks No. 784 and 1254.


II.C.3.b.i.  Check No. 784

Check No. 784, dated May 22, 1995, ordered $172,000 drawn from MPA's account to the Bank, of which the Trustee sought to

avoid $119,036.12.[8]  Although the Bank's president at the time of

the trial, John Lane, attested that the $119,036.12 were applied

to principal and interest on a Share Loan, the Bankruptcy Court

disregarded this testimony because Lane was not the Bank's

president at the time of the transfer, and thus lacked personal

knowledge.  Further, the court found that the Bank failed to

offer documentary evidence supporting Lane's assertion.  Bankr.

Op. 2 at 32-33 ¶ 25 (*citing* Tr. 278, 286-93, 322-23, 334-36).

The Bankruptcy Court concluded that because of the lack of

evidence on record of the purpose of the transfer, the Bank

failed to meet its burden of establishing how the transfers were

applied, which compelled a finding that MPA received no

consideration for the conveyance.  *Id*. at 33 ¶ 25, 49 ¶ 6.

The Bank argues that the Trustee's trial exhibits 18, 27,

and 28 show that on May 25, 1995, MPA repaid $77,500.00 of

principal on two of the Share Loans, thus proving that at least

a portion Check No. 784 was a Share-Loan transfer.  The Bank

contends that, though this Court has already affirmed the

finding that the Share-Loan payments were fraudulent

conveyances, the distinction is important, as the Bank seeks a

credit for portions of the Share-Loan transfers that it claims

---

[8] The Bank produced documents that the remaining $52,963.88 were
applied to a loan guaranteed by MPA.  Bankr. Op. 2 at 32 n.10.

it later returned to MPA.  The Trustee contends, and the Bank
does not dispute, that the exhibits cited by the Bank were never
moved for admission at trial and are thus unreviewable.  As the
purported evidence was never considered by the Bankruptcy Court,
it will not be considered on appeal.  *Chisholm-Ryder Co. v.
Buck*, 65 F.2d 735, 737 (4th Cir. 1933).

As the burden of persuasion was improperly placed on the
Bank, the Bankruptcy Court's finding with respect to Check No.
784 was incorrect.  Lacking any evidence of the purpose of the
$119,036.12 transfer, the Bankruptcy Court could only conclude
that the Trustee failed to prove the transfer was unsupported by
fair consideration.

II.C.3.b.ii.  Check No. 1254

As for the second unexplained transfer, Check No. 1254, the
Bankruptcy Court also found that the Bank produced no evidence
that MPA received fair consideration for the transfer.  However,
the Trustee attested that the total amount of the transfer was
accounted for by the Bank as a receivable due from Greenbaum.
Bankr. Op. 2 at 35 ¶ 31, Tr. 203, 206, Pl.'s Ex. 2.  As the
Trustee's testimony shows that, like MPA's payments of the
Greenbaums' personal loans, Check No. 1254 was applied
exclusively to pay Greenbaum's personal obligations, it is

evidence that there was no fair consideration returned to MPA. Thus, there was sufficient evidence for the Bankruptcy Court to find that the Trustee met his burden in proving Check No. 1254 was unsupported by fair consideration.

In sum, the Bankruptcy Court's findings of MPA's fraudulent intent regarding the non-Share-Loan transfers and the Bank's constructive knowledge of that intent were erroneous; but its findings that the non-Share-Loan transfers were unsupported by fair consideration, and thus constructively fraudulent, are supported by the record with the exception of the $119,036.12 transfer via Check No. 784. Accordingly, the portion of the Bankruptcy Court's judgment related to the non-Share-Loan transfers, $168,343.71,[9] will be reduced by $119,036.12, and affirmed in the amount of $49,307.59.

II.C.4.  Claim for Credit for Funds Transferred to MPA

The Bank asserts that the Bankruptcy Court has misunderstood its argument and the facts relating to its claim for a credit for a substantial portion of MPA's fraudulent July 14, 1997 Share-Loan transfer of $238,751.61 (check no. 1359). The Bank contends that it is due a credit for most of the

_____

[9] This Court affirmed $276,180.18 of the Bankruptcy Court's $444,523.89 January 31, 2007 judgment on the previous appeal. Op. 2 at 3.

fraudulent transfer, not because the repayment of the Share-
Loans eliminated MPA's liability to the Partnerships, but
because the Bank allegedly returned $233,000 of the July 14,
1997 transfer to MPA.

The record indicates that Greenbaum caused the Bank to make
the Share Loans to the Partnerships and deposit the proceeds in
the Partnerships' accounts at the Bank.  Tr. 135-141.  It also
shows that MPA's July 14, 1997 transfer of $238,751.61 was
applied by the Bank in part to pay off the outstanding principal
of the Share Loans, $233,000.  Pl.'s Ex. 10.  There is also
evidence, which the Bank asserts the Bankruptcy Court ignored,
that by November 28, 1997, a total of $235,000 was wired through
a series of transfers from the Partnerships' accounts at the
Bank to MPA.  Tr. 307-312; Def.'s Ex. 22-33.

On the previous appeal, this Court affirmed the Bankruptcy
Court's determination that Check No. 1359, and three other
Share-Loan transfers (Checks No. 1116, 1315, and 1374), were
fraudulent and recoverable by the trustee.  Bankr. Op. 1 at 11-
13; D.O. 2 at 2-3.  But the Bankruptcy Court's first opinion did
not mention, nor did this Court' previous review consider, the
evidence of the $235,000 transferred from the Partnerships'
accounts to MPA.

On remand, the Bankruptcy Court reasoned that because the

22

purpose of the Share-Loan scheme was to conceal Greenbaum's
embezzlement, the Bank's contention that the repayment of the
Share Loans restored the property of MPA's estate was
irrelevant:

> Whether the share loans were ever paid misses the point.
> Repayment of the share loans did not restore the embezzled
> funds to the limited partnerships, each of which still
> retains a substantial claim against the involuntary Chapter
> 7 debtors' estate.  Even if repayment of the share loans
> restored property to the debtor corporations, they remain
> liable to the partnerships for the funds that Greenbaum
> embezzled.

B.O. 2 at 52 ¶ 13.

As the Bank contends, the Bankruptcy Court's opinion does
not indicate whether it considered the evidence of the $235,000
transferred from the Partnerships' accounts to MPA.  But if such
evidence was ignored, it would be of no consequence to the
Bankruptcy Court's judgment, because the Bank's contention that
*it* returned $233,000 of loan proceeds to MPA is not supported by
this evidence.

Although the loan proceeds in the Partnerships' accounts
were subject to the Bank's security interest, they were the
Partnerships' property, given by the Bank in consideration for
the Partnerships' loan obligations well before the July 14, 1997
transfer from MPA to the Bank.  When MPA's transfer was applied
to pay off the loans, the Bank's security interests in the loan

proceeds were extinguished, and the money in the Partnerships'
accounts became the Partnerships' unencumbered property, as the
Bank admitted at trial.   Tr. 329.   Thus, the Bank's contention
that it deserves a credit for money "that came originally out of
the Bank's pocket," and "that it wired back to MPA" is wrong.
Appellant's Br. 36.   Loan proceeds come from a lender's pocket
as a matter of course, and banks routinely provide customers
with wire-transfers services; yet neither arrangement implies a
bank's ownership of the funds provided or transferred.   The Bank
lent money to the Partnerships; the Partnerships' obligations to
the Bank were satisfied by MPA's Share-Loan transfers; then the
Partnerships, not the Bank, transferred money to MPA.   The Bank
cannot claim a credit for the Partnerships' transfers of funds
to MPA merely because it was the lender of those funds or
provided the means of transfer.   Accordingly, the Bankruptcy
Court's avoidance of the entire July 14, 1997 Share-loan
transfer remains affirmed.


II.C.5.   Applicable Dates of Judgment

        The Bankruptcy Court's October 14, 2002 judgment was
affirmed in the amount of $276,180.18 with the remainder of the
judgment vacated and the case remanded for further fact-finding
and accordant legal conclusions.   A subsequent entry of judgment

24

was required for that vacated portion of the Bankruptcy Court's earlier judgment, but not for that part which this Court had affirmed.

Rather than distinguishing the amount of the affirmed portion of the October 14, 2002 judgment award, the Bankruptcy Court's January 31, 2007 judgment incorporates the amount into the subsequent award of $444,523.89, adding to the entire sum 6.20% prejudgment from the date of the Complaint, March 17, 2000, and 5.10% postjudgment interest from the date of the January 31, 2007 judgment.

The Bank argues that the Bankruptcy Court was wrong to enter a subsequent judgment with an altered interest award, particularly on the portion of the October 14, 2002 judgment that was affirmed.  The practical consequence of this error, the Bank contends, is that the applicable federal postjudgment rate has increased from 1.59% to 5.10% in period between the two entries of judgment, causing it to incur a significantly higher interest payment.  The Bank argues that if the final result of all appeals is essentially an affirmance of the original judgment, then all interest should accrue at the October 14, 2002 rate.  The Bank further contends that the awarded prejudgment interest rate of 6.20% is erroneous and should, at a minimum, be reduced to 5.1%.

The Bank's arguments overreach, yet they correctly reveal errors in the Bankruptcy Court's January 31, 2007 awards of prejudgment and postjudgment interest.

II.C.5.a.  Postjudgment Interest

Title 28 U.S.C. § 1961 provides that postjudgment interest:

> shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding. [sic] the date of the judgment. . . . . Interest shall be computed daily to the date of payment . . . and shall be compounded annually.

28 U.S.C. § 1961.   The federal statute providing postjudgment interest on money judgments in civil cases, 28 U.S.C. § 1961, applies to judgments entered by a bankruptcy court.  *In re Pester Refining Co.*, 964 F.2d 842, 849 (8th Cir. 1992); *Ocasek v. Manville Corp. Asbestos Disease Compensation Fund*, 956 F.2d 152, 154 (7th Cir. 1992).

"[P]ostjudgment interest [properly runs from the date of the entry of judgment."  *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 835-36 (1990).  "The purpose of postjudgment interest is to compensate the successful plaintiff for being deprived of compensation for the loss from the time between the ascertainment of the damage and the payment by the defendant."  *Id*. at 835-36.  The accrual of postjudgment

interest is not triggered by a judgment on damages that was not supported by the evidence, as such damages were not then meaningfully ascertained.  *Id*. at 836; *McKnight v. Circuit City Stores, Inc.,* 14 Fed. App'x 147, 155 (4th Cir. 2001) (unpublished opinion).

Thus, the affirmed portion of the Bankruptcy Court's October 14, 2002 $444,523.89 judgment, $276,180.18, began to accrue postjudgment interest on that date, but the remainder of the judgment, vacated for lacking an evidentiary basis, did not. The weekly average 1-year Treasury yield for the week ending October 11, 2002, was 1.59% per annum.  Federal Reserve Statistical Release, H.15(519) Selected Interest Rates, Oct. 15, 2002, *available at* http://www.federalreserve.gov/releases/ h15/20021015/.

The portion of the Bankruptcy Court's January 31, 2007 judgment that was not previously affirmed, and which this Court will affirm as legally and factually supported, $49,307.59, was meaningfully ascertained on January 31, 2007, and thus will accrue postjudgment interest only from then.  The weekly average 1-year Treasury yield for the week ending January 26, 2007, was 5.10% per annum.  Federal Reserve Statistical Release, H.15(519) Selected Interest Rates, Jan. 29, 2007, *available at* http://www.federalreserve.gov/releases/ h15/20070129/.

27

II.C.5.b.  Prejudgment Interest

The decision to award prejudgment interest lies within the sound discretion of the bankruptcy judge.  *In re Cybermech, Inc.*, 13 F.3d 818, 822 (4th Cir. 1994); *Phoenix American Life Ins. Co. v. Devan*, 308 B.R. 237, 242 (D. Md. 2004) *aff'd, In re Merry-Go-Round Enterprises, Inc.*, 400 F.3d 219, 44 (4th Cir. 2005).  In cases involving federal questions, the determination of the rate of prejudgment interest is also a matter of discretion.  *United States v. Dollar Rent A Car Systems, Inc.*, 712 F.2d 938, 940 (4th Cir. 1983).

The Bankruptcy Court's decision to apply the federal postjudgment interest rate under 28 U.S.C. § 1961 as of the date of the Complaint, March 17, 2000, was not an abuse of discretion.  However, the rate applied by the Bankruptcy Court, 6.20%, is not the correct federal postjudgment interest rate for that date.  Section 1961 states that the applicable rate shall be "equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week *preceding*. [sic] the date of the judgment."  28 U.S.C. § 1961 (emphasis added).  The Bankruptcy Court applied the rate for the calendar week ending on the date the Complaint was filed, March 17, 2000, which was not published until March 22, 2000.  Federal Reserve

28

Statistical Release, H.15(519) Selected Interest Rates, Mar. 22, 2000, *available at* http:// www.federalreserve.gov/releases/ h15/20000322/.  The weekly average 1-year Treasury yield for the week ending March 10, 2000 was 6.18% per annum.  *Id*.

Accordingly, the Bankruptcy Court's awards of prejudgment and postjudgment interest will be modified as necessary to conform to the appropriate rates and dates of accrual.


III.  Motion to Waive Supersedeas Bond and Stay Execution

As the Court's Memorandum Opinion and Order will end the appeal, the Bank's motion to waive supersedeas and stay execution of the Bankruptcy Court's January 31, 2007 judgment pending the appeal will be denied as moot.


IV.  Conclusion

For the reasons stated above, the judgment of the Bankruptcy Court will be affirmed in part and modified in part. The portion of the Bankruptcy Court's $444,523.89 judgment not previously affirmed, $168,343.71, will be affirmed in the amount of $49,307.59 and reduced by $119,036.12.  The judgment will be modified to: (1) award prejudgment interest at 6.18% on the affirmed portion of the October 14, 2002 judgment, $276,180.18, from March 17, 2000 to October 14, 2002; (2) award postjudgment

interest of 1.59% on that same portion, $276,180.18, from October 14, 2002 to the date of payment; (3) award prejudgment interest at 6.18% on the affirmed portion of the January 31, 2007 judgment, $49,307.59, from March 17, 2000 to January 31, 2007; and (4) award postjudgment interest of 5.10% on that same portion, $49,307.59, from January 31, 2007 to the date of payment.  Prejudgment interest shall be calculated as under 28 U.S.C. § 1961(b) but computed daily to the appropriate date of judgment.  The Bank's motion to waive supersedeas and stay execution pending appeal will be denied as moot.


 August 3, 2007                          /s/
Date                           William D. Quarles, Jr.
                               United States District Judge